UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MARVIN DAVIS and SALINA McCOY,[1]

Plaintiffs,

v.

KING COUNTY, *et al.*

Defendant.

CASE NO.  C02-2440RSM

MEMORANDUM ORDER
GRANTING IN PART AND
DENYING IN PART
DEFENDANTS' MOTIONS FOR
SUMMARY JUDGMENT

## I.  INTRODUCTION

This matter comes before the Court on defendant Keller's and defendant Rayborn's Motions for Summary Judgment.  (Dkts. #107 and #112).  Defendants argue that plaintiffs have failed to support their allegations that any constitutional violations have occurred, plaintiffs have failed to support their state law claims, and, even if such claims were supported, defendants are protected by qualified immunity.  Plaintiffs respond that "the available evidence demonstrates

---

[1] Plaintiffs Davis and McCoy are now married and apparently use the surname Taylor.  (*See* Dkts. #76 and #139).  However, in this Order, for convenience and ease of reading the Court will use plaintiffs' former, individual surnames as they appear in the caption of the case.

MEMORANDUM ORDER
PAGE - 1

1    legion disputes of material fact," and therefore, summary judgment is not appropriate.[2] (Dkt.

2    #150). For the reasons set forth below, the Court disagrees with defendants in part, and hereby

3    GRANTS IN PART and DENIES IN PART defendants' motions.

4    **II.  DISCUSSION**.

5        **A.  Background**

6        In this lawsuit, plaintiffs claim that their federal civil rights were violated when

7    defendants, deputies with the King County Sheriff's Department, made an unlawful traffic stop,

8    unlawfully searched plaintiffs' bodies, and used excessive force when subsequently detaining

9    plaintiff Davis.  Plaintiffs also make state law claims of false imprisonment/false arrest, assault,

10   outrage, malicious prosecution and negligent infliction of emotional distress.  The claims by each

11   plaintiff are discussed separately below.

12       This action arises from a traffic stop and subsequent arrest of plaintiff Davis on the

13   afternoon of January 5, 2001, in Burien, Washington.  According to the Complaint, Davis was

14   driving his car, and his then-girlfriend, now-wife, Salina McCoy, who was also pregnant at the

15   time, was a passenger in the front seat.  Davis claims that he pulled out of a parking lot onto 1st

16   Avenue South.  Davis asserts that he checked the traffic light south of the parking lot, which

17   displayed a red light.  There was no traffic, so he made a right turn out of the lot.  He explains

18   that the road is narrow, so he turned into the left northbound lane of 1st Avenue to avoid hitting

19   the curb.[3]

20   ――――――――――――――――

21       [2] Plaintiffs also argue that summary judgment is "premature because the defendants, in particular
     King County, have not complied with the disclosure and discovery requirements of the Federal Rules of
22   Civil Procedure." (Dkt. #150 at 1).  However, plaintiffs have not provided any briefing on that issue;
     therefore, the Court will restrict its analysis to plaintiffs' other arguments.  The Court also notes that
23   King County is no longer a defendant in this case.

24       [3] Defendant police officers Keller and Rayborn state that they were patrolling the area behind the
     Fred Meyer store located at 1st Avenue and 140th Street in Burien.  As they were exiting the parking lot
25   of the shopping plaza, they drove behind Davis' vehicle, and observed him make a right turn without
26   using his turn signal to indicate the turn.  Apparently, they then observed Davis cross into the far left lane

MEMORANDUM ORDER
PAGE - 2

1    Davis states that as soon as he completed the turn, he noticed an unmarked, dark blue

2    Ford Taurus behind him.  He then noticed that the car had flashing police lights on the dash, the

3    officers apparently called for him to pull over on the loudspeaker, and he pulled over to the right

4    side of the road.  Defendant Rayborn, the driver of the unmarked vehicle, walked over to the

5    driver's side window of Davis' car.  Defendant Keller approached the passenger's side window.

6    Davis claims that he rolled down his window and asked why he had been pulled over.  Rayborn

7    apparently answered, "Don't worry about it.  You'll find out when I give you your ticket."

8    Davis states that he then gave Rayborn his license and registration.[4]

9    Defendants returned to their vehicle with Davis' license and registration.  Davis states

10   that he then sat in his car for approximately 15 minutes, watching the deputies in his rearview

11   mirror.  He saw the deputies laughing and joking in their vehicle.  Davis then had to move his

12   vehicle forward to allow a truck to pass into a driveway, in front of which Davis had parked, and

13   then waited about five minutes more.  Frustrated at having to wait so long, Davis then exited his

14   vehicle to ask the deputies what was taking so long.[5]

15   Defendants ordered Davis to get back into his car.  Davis said he would not get back

16   into his car until he knew why he had been pulled over.  Witnesses describe seeing Davis yelling

17   very loudly, and cursing at the deputies.  Defendants asked Davis to move to the right passenger

18   side of his car, and out of the street.  Davis complied, but remained outside of his car.  Davis

19   states that Keller then began to push him towards his car.  He asserts that every time he was

20   pushed, he did not resist, and allowed himself to be moved.

21

22   without using his turn signal.

23   [4] Rayborn asserts that he approached Davis' window and asked for his license, registration and
     proof of insurance.  He states that Davis gave him his license and registration, but he had no proof of
24   insurance.  Davis was subsequently cited for that violation.

25   [5] Relying on the CAD printout from the incident, defendants assert that Davis waited only two or
     three minutes before exiting his car.  They make no mention of the driveway Davis was blocking, or of
26   Davis moving his car forward.

MEMORANDUM ORDER
PAGE - 3

1   Davis states that he again asked defendants why he had been pulled over.  Davis states

2   that defendants were quiet for a moment, but then Rayborn said, "Why should I tell you?"

3   Davis apparently responded that he had a right to know, which then prompted Keller to say

4   something to the effect of, "Mr. Davis is not cooperating."  Davis apparently asked Keller to

5   explain his remark, but defendants just grinned at each other.[6]

6   It is not entirely clear from the record what happened next.  Davis states that defendants

7   continued to joke around, and refuse to tell him why he had been pulled over.  Defendants assert

8   that Davis became more and more agitated, yelling and screaming profanities at them.  Plaintiffs

9   assert that Rayborn repeatedly asked Davis if he was going to sign a traffic citation, and Davis

10  kept responding that he couldn't sign a ticket if he wasn't given a ticket, and that he wouldn't

11  sign one if it didn't tell him what he was being cited for.  Defendant Rayborn states that he

12  presented a citation to Davis and asked him to sign the Notice of Infraction.  Apparently

13  Rayborn told Davis that he could be arrested and go to jail for refusing to sign.  When Davis

14  continued to refuse, Rayborn returned to his vehicle for the criminal citation book.  According

15  to defendants, Davis continued to scream and yell, and began swinging his arms near Keller.

16  Again, it is not entirely clear from the record what happened next, but one of the

17  defendants told Davis he was under arrest for refusing to sign his traffic citation.  Davis claims

18  that Keller grabbed and twisted his left wrist and arm, yelling racial slurs at him.  The deputies

19  then apparently pushed Davis towards their vehicle, which was about eight feet away from

20  Davis' car.  Defendants claim they were trying to handcuff Davis, but he struggled.  Keller then

21  radioed for his backup to "step it up."  Davis states that the deputies leaned him against their

22  vehicle and began pushing him onto the hood.  Then, without warning, Keller gave a burst of

23

24  _____

25  [6] Defendants both assert that Rayborn had returned to his car to finish completing the traffic
    citation, and he was not involved in any such exchange with Davis.  Keller also states that he radioed for
26  backup before approaching Davis because Davis' behavior was not normal.

MEMORANDUM ORDER
PAGE - 4

pepper spray to Davis' face, and attempted to trip him.[7]

Witnesses state that Davis continued to struggle, swinging his arms and attempting to break free, which prompted one of the witnesses to approach the officers and ask if they needed help. Defendants assert that this witness grabbed some part of Davis' body so they could bring him to the ground. Davis states that he was forced to the ground, someone put a knee in his back, Keller continued to refer to him using racial slurs, and someone began to choke him. He also states that he heard and felt one of the officers spit in his ear. Other deputies finally arrived on the scene, and Davis was handcuffed and taken into custody. Mr. Davis claims that he was roughly searched, and then pushed into the back of a patrol vehicle.[8]

The deputies then approached Davis' vehicle and asked for a witness statement from McCoy. They also searched the car for weapons. McCoy asserts that Keller conducted a pat down search of her body, but Keller doesn't recall conducting such a pat down. He does admit that it is entirely possible he did so. McCoy states that while giving her statement, she was constantly interrupted by Keller, and was told by Keller that he did not know why Davis had been pulled over. All parties agree that McCoy was polite and cooperative. McCoy states that she reviewed the witness statement, and it was inaccurate, but she signed it because she was frightened and confused.

In the meantime, an EMT was called to rinse the pepper spray from Davis' eyes. Keller opened the car to allow the EMT access to Davis. The EMT requested that Keller move away because he was making Davis nervous. After Davis was treated, he was driven to the Burien Police Department headquarters, where he was transferred to a different car, and driven to the

---

[7] Keller states that he warned Davis he would use pepper spray if Davis continued to struggle. When Davis continued to resist, Keller gave him a burst of pepper spray.

[8] Plaintiff McCoy remained in the car during this altercation. However, she states that she pleaded with Keller not to pepper spray Davis. She also states that she saw Keller kneel on Davis' back, and saw Rayborn place his foot on the side of Davis' face and then call for backup. She further states that after Davis was on the ground, the deputies clapped in a congratulatory manner.

MEMORANDUM ORDER
PAGE - 5

Kent Regional Justice Center.  Davis asserts that defendants began concocting a story about

what took place while they drove him.  Upon arriving at the Regional Justice Center, defendants

apparently turned over some of Davis' personal belongings for processing, but failed to turn

over his driver's license.[9]  Davis states that he continued to be harassed and humiliated during

processing.  Eventually, Davis was allowed to leave on personal recognizance.  He asserts that

when he left, he still did not know what charges had been cited against him.

Davis eventually learned that four criminal charges had been brought against him: Failure

to Obey an Officer, Obstructing a Law Enforcement Officer, Resisting Arrest, and Harassment

of Officers Rayborn and Keller.  On July 31, 2001, the charge of Failure to Obey was dismissed.

On September 11, 2001, the remaining three charges were dismissed.[10]

Plaintiffs have alleged numerous federal and state causes of action, including violation of

their civil rights pursuant to 42 U.S.C. § 1983 based on an unlawful search and seizure, and

assault and battery, false arrest and false imprisonment, outrage, negligent infliction of emotional

distress, and malicious prosecution under Washington State law.  They request a monetary

award in the amount of $4,000,000 in compensatory damages, and $6,000,000 in punitive

damages.

## B. Summary Judgment Standard

Summary judgment is proper where "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247

---

[9] Davis asserts that he never recovered his driver's license and was forced to apply for a
replacement after he was released.

[10] Davis was also charged with three traffic infractions.  Two of those charges, Unsafe Lane
Change and No Insurance, were dismissed on February 12, 2001.  The remaining charge of Failure to
Sign Notice of Infraction was dismissed on July 31, 2001.

MEMORANDUM ORDER
PAGE - 6

1    (1986).   The Court must draw all reasonable inferences in favor of the non-moving party.  *See*

2    *F.D.I.C. v. O'Melveny & Meyers*, 969 F.2d 744, 747 (9th Cir. 1992), *rev'd on other grounds,*

3    512 U.S. 79 (1994).  The moving party has the burden of demonstrating the absence of a

4    genuine issue of material fact for trial.  *See Anderson*, 477 U.S. at 257.  Mere disagreement, or

5    the bald assertion that a genuine issue of material fact exists, no longer precludes the use of

6    summary judgment.  *See California Architectural Bldg. Prods., Inc., v. Franciscan Ceramics,*

7    *Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987).

8        Genuine factual issues are those for which the evidence is such that "a reasonable jury

9    could return a verdict for the non-moving party." *Anderson,* 477 U.S. at 248.  Material facts are

10   those which might affect the outcome of the suit under governing law. *See id.*  In ruling on

11   summary judgment, a court does not weigh evidence to determine the truth of the matter, but

12   "only determine[s] whether there is a genuine issue for trial." *Crane v. Conoco, Inc.*, 41 F.3d

13   547, 549 (9th Cir. 1994) (citing *O'Melveny & Meyers*, 969 F.2d at 747).

14   **C.  Motion to Strike Response, Declarations and Exhibits Under Local Rule 7(g)**

15       As a threshold matter, the Court first addresses defendants' request to strike certain

16   materials, including plaintiffs' response to the motion for summary judgment, as well as several

17   declarations and exhibits in support of that response, and any exhibits attached to those

18   declarations.  (*See* Dkts. #157 at 1-4 and #158 at 1-3).  The Court has reviewed the materials at

19   issue, and finds as follows:

20                      *1.  Plaintiffs' Response*

21       Defendants first raise arguments pertaining to plaintiffs' response to the instant motions

22   for summary judgment.  Defendant Keller notes that plaintiffs have impermissibly filed a

23   response of 31 pages in length, which exceeds the 24-page limit under the Local Rules by seven

24   pages.  Keller asks this Court not to consider any arguments past page 24, and asks that the

25   Court strike pages 25-31 from the record.  Defendant Rayborn asks this Court to strike the

26

MEMORANDUM ORDER
PAGE - 7

1   response in its entirety.  Rayborn notes that while this Court allowed plaintiffs to refile their

2   response in order to remedy an earlier deficiency, plaintiffs instead rewrote their pleadings,

3   introducing new arguments and contentions not previously raised.

4         The Court declines to strike the response in its entirety; however, it will strike pages 25-

5   31 due to plaintiffs' violation of the Local Rules.  Local Rule CR 7(e)(3) clearly states that

6   responses to summary judgment motions shall not exceed 24 pages in length.  Had plaintiffs

7   desired to exceed that length, they were required to file a motion to file an overlength brief

8   pursuant to Local Rule 7(f).  Plaintiffs filed no such motion.  Accordingly, the Court agrees that

9   it is proper to strike the portion of the brief in excess of 24 pages.

10        In addition, the Court now admonishes plaintiffs' counsel for his apparent attempt to

11  circumvent this Court's previous Order granting him a short extension of time to file his

12  response to defendants' motions for summary judgment.  In that Order, the Court explained that

13  while plaintiffs' counsel had continuously failed to follow the Court's Local Rules, it would not

14  prejudice his clients, and would accept a late response which had already been filed.  (*See* Dkt.

15  #146).  However, because plaintiffs' counsel had also improperly filed a variety of declarations

16  and exhibits that were not attached to any legal memoranda or filed in support of any briefing,

17  the Court ordered plaintiffs' counsel to properly refile the response, along with its supporting

18  declarations and exhibits, so that the Court and defendants would be able to determine which

19  legal arguments the declarations and exhibits supported, and how such declarations and exhibits

20  were to be considered.  (*See* Dkt. #146 at 3).  The Order was clear – by both its language and

21  the imposition of a one-day refiling deadline – that plaintiffs were to simply refile the response as

22  it had previously been filed, along with any of its supporting declarations or exhibits which had

23  also already been filed.  It was not an invitation to submit a newly written response, or new

24  declarations and exhibits.  Accordingly, the Court will strike any new declarations and exhibits

25  from the record which had not been filed as of the date of its previous Order regarding the

26

MEMORANDUM ORDER
PAGE - 8

1  request for extension of time, as further discussed below, and will not consider those documents

2  on these motions for summary judgment.

3  *2.  Declaration of Emily Reilly and Its Exhibits*

4  There are two declarations from Emily Reilly at issue.  The most recent declaration, and

5  its supporting exhibits, filed as Exhibit N to plaintiffs' counsel's first declaration (Broberg I),

6  were not filed in the same form as the declaration of Emily Reilly filed prior to the Court's

7  October 20, Order regarding plaintiffs' request for extension of time.  (*See* Dkts. #151, Ex. N

8  and #124).  Instead, plaintiffs have refiled the declaration with "clarifications" that were made on

9  October 21, citing to various exhibits.  For that reason, the Court will strike the "clarified"

10  declaration of Emily Reilly and its supporting exhibits.

11  The Court will also strike the original Emily Reilly declaration found at Dkt. #124 and

12  Dkt. #151, Ex. N.  Plaintiffs have never identified Ms. Reilly as a witness, expert or otherwise,

13  and her testimony regarding her opinions on distances, visibility, and lines of sight in the Fred

14  Meyer parking lot at 1st Ave South and 140th Street in Burien, and the accuracy of the

15  photographs from the King County Government iMap service, is based solely on the

16  representations and testimony of others.  Accordingly, the Court will not consider either

17  declaration by Emily Reilly or the supporting exhibits.

18  *3.  Declaration of Larry Freeman and Its Exhibits*

19  Defendants next ask this Court to strike the declaration of Larry Freeman, and its

20  supporting exhibits, based on a hearsay objection.  Mr. Freeman states that he is a private

21  investigator working for plaintiffs' counsel, who interviewed two witnesses in this case.  The

22  exhibits to his declaration contain the reports he wrote to plaintiffs' counsel after he interviewed

23  each witness by telephone.  Mr. Freeman states that the reports are based on notes taken

24  contemporaneously with the telephone interviews.  The reports recount the statements made by

25  each witness during the interviews.

26

MEMORANDUM ORDER
PAGE - 9

The Court will not strike Mr. Freeman's declaration itself.  The declaration merely states what he does for a living, his educational background, and the fact that he interviewed two witnesses by telephone.  However, the Court agrees with defendants that the statements contained in the two exhibits offered in support of Mr. Freeman's declaration are inadmissible hearsay, as plaintiffs appear to be offering those statements to prove the truth of the matter asserted.  Fed. R. Evid. 801(c) and 802.  The Court finds no applicable exception to the hearsay rule at this time.  *See* Fed. R. Evid. 803, 804 and 807.  Accordingly, the Court will strike the exhibits attached to Mr. Freeman's declaration from consideration on these motions for summary judgment.  (*See* Dkt. #151, Ex. M, Attachments A and B).

### 4.  Declarations of Marvin Taylor (Davis)

The declaration of Marvin Taylor (Davis) submitted at Dkt. #151, Ex. B, is a new exhibit not previously filed prior to the Court's Order regarding plaintiffs' request for extension of time.  As noted above, the Court will not consider any such exhibit on these motions for summary judgment.  Accordingly, the exhibit/declaration will be stricken.

The declaration of Marvin Taylor (Davis) submitted at Dkt. #151, Ex. E, is not signed either manually or electronically.  Accordingly, it will be stricken from consideration on these motions for summary judgment.

### 5.  Declaration of Salina McCoy

The declaration of Salina McCoy submitted at Dkt. #151, Ex. D, is not signed either manually or electronically.  Accordingly, it will be stricken from consideration on these motions for summary judgment.

### 6.  Statement of John Seltzer

Defendant Rayborn asks the Court to strike the Statement of John Seltzer on the basis that it is inadmissible hearsay, it contains inadmissible hearsay, and it is not self-authenticating.  The Court agrees that the statement is hearsay itself, and contains hearsay.  However, the Court

finds that the "Records of Regularly Conducted Activity" exception to the hearsay rule applies, and therefore, the evidence is admissible. Fed. R. Evid. 803(6). Accordingly, the Court will not strike the statement of John Seltzer from the record.

### D. § 1983 Civil Rights Violation - Unlawful Search and Seizure

Plaintiff Davis alleges violations of his civil rights under 42 U.S.C. § 1983, based on an allegedly unlawful traffic stop and allegedly unlawful arrest subsequent to that stop, and use of excessive force during arrest. (Dkt. #1 at 13). Plaintiff McCoy alleges violations of her civil rights under 42 U.S.C. § 1983, based on an allegedly unlawful traffic stop and allegedly unlawful search of her body subsequent to that stop. (Dkt. #1 at 13-14). To prevail on these claims, plaintiffs must prove that defendants acted under color of law and deprived plaintiffs of a constitutionally-protected right. 42 U.S.C. § 1983; *Jensen v. City of Oxnard*, 145 F.3d 1078, 1082 (9th Cir. 1998) (citing *Wood v. Ostrander*, 879 F.2d 583, 587 (9th Cir. 1989). Accordingly, to successfully defend against summary judgment, plaintiffs must demonstrate that there is a genuine issue of material fact as to probable cause for the traffic stop, a genuine issue of material fact as to the lawfulness of the subsequent arrest and pat down search, and a genuine issue of material fact as to the use of force during arrest.

### *1. Traffic Stop*

The U.S. Supreme Court has clearly held that the decision to stop an automobile is reasonable when the police have probable cause to believe that a traffic violation has occurred. *Whren v. United States*, 517 U.S. 806, 810 (1996). Washington state traffic laws require that a driver use his turn signal, showing an intent to turn or move left or right, "continuously during not less than one hundred feet traveled by the vehicle turning," and that a driver intending to make a right turn do so as "close as practicable to the right-hand curb or edge of the roadway." RCW 46.61.305(2) and 46.61.290(1). Defendant Rayborn asserts that both he and Keller saw Davis make a right turn and subsequent lane change without signaling. While defendant Keller

MEMORANDUM ORDER
PAGE - 11

argues that he did not participate in the decision to stop plaintiffs' car, and therefore he cannot be held liable for any such stop, he agrees that Davis failed to use his turn signal.

Plaintiff Davis asserts that he used his right turn signal, but admits that he did not turn into the correct lane when making his right turn.  Plaintiff McCoy has testified that she can't remember if Davis used his turn signal, and also admits that Davis did not turn into the correct lane when making his right turn.  Although plaintiffs believe that making a right turn into the correct lane was not "practicable," that question goes to the merits of a traffic citation, not whether there was probable cause to believe that a violation occurred.  Therefore, the Court finds that plaintiffs' wide turn provided enough probable cause that a traffic violation had occurred for the initial stop.

While plaintiffs attempt to persuade the Court that, even if Davis failed to use his turn signal and made a wide turn, there is no way that defendants could have seen him, the Court finds no reasonable support for that argument.  Plaintiffs' argument appears to be based on the inadmissible declaration and supporting exhibits of Emily Reilly.  However, the Court has stricken that declaration from consideration.  In contrast, both defendants have testified that they were directly behind Davis, and both Davis and McCoy have testified that the deputies appeared behind their vehicle shortly after Davis pulled onto 1st Ave.  The reasonable inference from all of this testimony is that the deputies were in a position to witness the alleged traffic infraction. While the Court agrees that plaintiffs have raised an issue of fact with regard to whether Davis actually used his turn signal or whether it was practicable to turn into the closest right-hand lane, those issues are not material as to probable cause that a traffic infraction occurred, especially when Davis admits that he failed to turn into the correct lane.  Accordingly, the Court finds that plaintiffs have raised no genuine issue of material fact as to probable cause for the initial traffic stop, and the portions of plaintiffs' § 1983 claims based on an allegedly unlawful traffic stop are dismissed.

MEMORANDUM ORDER
PAGE - 12

1                             *2. Detention of Plaintiffs During Traffic Stop*

2        Plaintiffs have also claimed that their civil rights were violated when defendants

3 unlawfully "seized" them during the traffic stop. Defendants argue that any seizure after the

4 stop was reasonable, and therefore, lawful.

5        Temporary detention of individuals during a traffic stop has been deemed a "seizure,"

6 and as such, the U.S. Constitution requires that it be reasonable under the circumstances.

7 *Whren*, 517 U.S. at 817-18. Likewise, under Washington law, a person stopped for a traffic

8 infraction may be detained for a reasonable period of time "to identify the person, check for

9 outstanding warrants, check the status of the person's license, insurance identification card, and

10 the vehicle's registration, and complete and issue a notice of traffic infraction." RCW

11 46.61.021(2); *State v. Glossbrener*, 146 Wn.2d 670, 676 (2002). Plaintiffs assert that they were

12 forced to wait in their vehicle for 20-25 minutes while defendants sat in their car, joking around,

13 and needlessly delaying the issuance of a traffic citation. While Davis admitted at deposition that

14 he had no specific recollection of looking at a clock, McCoy remembered looking at a clock, and

15 they both maintain their assertion that they waited approximately 20 minutes. Defendants argue

16 that plaintiffs only waited two or three minutes, relying on the CAD report from the incident.

17 However, as plaintiffs point out, there remains the possibility that plaintiffs waited 20-25

18 minutes prior to defendants' initiation of an inquiry into the status of Davis' driver's license, or

19 whether he had any outstanding warrants. Thus, the Court agrees that the CAD report itself

20 does not provide definitive evidence that plaintiffs did not wait as long as they say they did.

21        Accordingly, viewing the facts in the light most favorable toward plaintiffs, as is required

22 on these motions for summary judgment, the Court finds that there is a question of fact as to

23 how long plaintiffs were detained after the initial traffic stop, and whether that length of time

24 was reasonable under the circumstances. That is a question for the jury. Therefore, the Court

25 concludes that summary judgment in favor of defendants is not appropriate on this issue.

26

MEMORANDUM ORDER
PAGE - 13

### 3. Arrest of Plaintiff Davis

Defendants next argue that the arrest of Davis subsequent to the traffic stop was lawful because they had probable cause. Defendants assert there was probable cause both because Davis created a situation that was dangerous to himself and to others, and because Davis failed to acknowledge receipt of his traffic citation by refusing to sign the notice portion of the citation.

Under RCW 9A.76.020, a person is guilty of obstructing a law enforcement officer if he "willfully hinders, delays, or obstructs" that officer in the discharge of his or her official powers or duties. Davis admits that he refused to get back into his car when deputies ordered him to do so, and admits that he was angry and yelling at the deputies. While he also states that he complied with the deputies' orders to move out of the road, and that he did not resist any force by defendant Keller to move him towards his car, two witnesses describe seeing Davis yelling, and swinging his arms at the deputies. Both the U.S. Supreme Court and the Washington State courts have held that officers may take reasonably necessary steps to protect their personal safety and maintain the status quo during the course of a traffic stop. *See Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1986); *State v. Mendez*, 137 Wn.2d 208, 214-16 (1999); *State v. Kennedy*, 107 Wn.2d 1, 8 (1986); *McKinney v. City of Tukwila*, 103 Wn. App. 391, 405 (2000). This Court agrees with defendants that such authority includes the right to order a person to return to his or her vehicle. Thus, the moment Davis refused to follow the deputies' orders to get back in his vehicle, it appears that there was probable cause to arrest Davis. However, defendants did not arrest Davis for that reason. Indeed, they have explicitly articulated, and otherwise make clear in their briefing, that they chose not to arrest him at that time. Instead, it was not until Davis refused to sign the traffic citation that he was placed under arrest. Thus, the Court turns to that issue.

Defendants argue that Davis' refusal to sign the Notice of Traffic Infraction provides

MEMORANDUM ORDER
PAGE - 14

1   sufficient probable cause for arrest.  In support of that argument, they first point to RCW

2   46.64.015 that requires a person arrested for a misdemeanor traffic infraction to give a written

3   promise to appear in Court in order to secure release.  RCW 46.64.015.  Defendants also rely on

4   RCW 46.61.021 in support of their probable cause argument.  That statue provides that "[a]ny

5   person requested to identify himself or herself to a law enforcement officer pursuant to an

6   investigation of a traffic infraction has a duty to identify himself or herself, give his or her

7   current address, and sign an acknowledgement [sic] of receipt of the notice of infraction."  RCW

8   46.61.021(3).  Washington courts have held that both of these statutes provide a basis to

9   continue to detain a person or take that person to jail.  *City of Port Orchard v. Tilton*, 77 Wn.

10  App. 178, 180 (1995).[11]

11       However, Davis has raised significant questions as to whether he was actually presented

12  with a citation to sign, and whether any such citation was complete.  Not only do Davis and

13  McCoy testify that Rayborn never gave Davis an infraction to sign, they present significant

14  evidence pertaining to when a copy of the traffic citation was received, when it was filled out,

15  and who he obtained a copy from.  For example, Davis testifies that he never saw a copy of a

16  traffic citation until he obtained one from the court sometime after he was released from jail.  He

17  then points to inconsistencies in dates on different copies of the citation, and notes that in his

18  copy the date appears to have been covered with White-Out and then xeroxed.  He also notes

19  that no original of the citation has ever been produced.  The reasonable inference in favor of

20  plaintiffs is that no traffic citation was completed until well after the subsequent arrest occurred.

21  These issues go directly to whether Davis was actually presented with a traffic infraction to sign,

22  and whether there was probable cause to arrest Davis for an alleged failure to sign.  These are

23  questions for the jury to resolve.  Therefore, the Court concludes that summary judgment in

24  _____

25       [11] In this same case, the Washington Court of Appeals clarified that a person does not commit a
    crime merely by virtue of refusing to sign the notice, but "if he or she refuses to make such a promise, he
26  or she can be taken to jail. . . ."  *Id.*

MEMORANDUM ORDER
PAGE - 15

favor of defendants is not appropriate on this issue.

### 4. Excessive Force During Arrest

Defendants argue that the use of force used on Davis during his arrest was lawful. The Court, having stricken the improper overlength briefing by plaintiffs' counsel in response to that argument, deems defendants' summary judgment motions pertaining to the force used during arrest unopposed. Accordingly, plaintiff Davis' § 1983 claim based on excessive force during arrest is dismissed.

### 5. Pat Down Search of Salina McCoy

Defendants argue that any pat down search of plaintiff McCoy conducted subsequent to Davis' arrest was lawful. The Court, having stricken the improper overlength briefing by plaintiffs' counsel in response to that argument, deems defendants' summary judgment motions pertaining to McCoy's pat down search unopposed. Accordingly, plaintiff McCoy's § 1983 claim based on an allegedly unlawful pat down search is dismissed.

### E. Qualified Immunity from § 1983 Claims

Having determined that plaintiffs' § 1983 claims based on an allegedly unlawful "seizure" after the traffic stop and on the allegedly unlawful arrest of Davis will not be dismissed on summary judgment, the Court now turns to defendants' qualified immunity argument. Defendants argue that, even if they had conducted an unlawful search and seizure of plaintiffs, they are protected by qualified immunity because they reasonably believed that their actions were lawful in light of the clearly established law and information they possessed at the time. As further explained below, the Court disagrees.

Qualified immunity shields government officials, acting within one of their discretionary functions, from civil liability as long as their conduct "does not violate clearly established constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Once a government official raises the issue of qualified immunity,

MEMORANDUM ORDER
PAGE - 16

"the plaintiff bears the burden of proving that the right allegedly violated was 'clearly established' at the time of the occurrence at issue." *Davis v. Scherer*, 468 U.S. 183, *reh'g denied*, 468 U.S. 1226 (1984). To be considered "clearly established" for the purposes of qualified immunity analysis, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The Supreme Court has directed that the inquiry into whether or not a claimed right was "clearly established" must focus upon the right not in a general, abstract sense, but rather in a practical, "particularized" sense. *See, id.* at 640. Likewise, the Ninth Circuit Court of Appeals has noted that "broad rights must be particularized before they are subjected to the clearly established test," and the constitutional right referenced in *Harlow*, *supra*, "is not a general constitutional guarantee . . . but its application in a particular context." *Kelley v. Borg*, 60 F.3d 664, 667 (9th Cir. 1995).

The determination of qualified immunity also necessitates an inquiry into whether a reasonable officer could have believed his particular conduct at issue was lawful under the circumstances. *Romero v. Kitsap County,* 931 F.2d 624, 627 (9th Cir. 1991).

In the instant case, the Court has declined to dismiss plaintiffs' § 1983 claim based on an allegedly unlawful seizure after a traffic stop. Neither party disputes that the temporary detention of individuals during a traffic stop has been deemed a "seizure," and as such, the U.S. Constitution requires that it be reasonable under the circumstances. *Whren*, 517 U.S. at 817-18. Thus, there is no question that, at the time of the traffic stop, plaintiff had a clearly established right to be free of an unreasonable detention. However, as discussed above, there are unresolved factual issues surrounding the length of time plaintiffs were detained prior to and during defendants' initiation of an inquiry into Davis' identity, status of his driver's license, and whether there were any outstanding warrants for his arrest. While the Court agrees that if plaintiffs prove that the deputies kept them waiting for 20-25 minutes prior to initiating any type

MEMORANDUM ORDER
PAGE - 17

1   of inquiry into Davis' identity and status of driver's license for the sole purpose of harassment,

2   that would be an unreasonable detention, the jury must first determine whether plaintiffs were

3   indeed detained for that length of time, and whether that was reasonable under the

4   circumstances.

5         Courts have struggled with the qualified immunity analysis on summary judgment when

6   there are issues of fact relevant to that analysis. *See Sloman v. Tadlock*, 21 F.3d 1462, 1467-69

7   (9th Cir. 1994). While the question of clearly established law is for the Court, it is the jury that

8   is "best suited to determine the reasonableness of an officer's conduct in light of the factual

9   context in which it takes place." *Id.* at 1468. The Court recognizes that the existence of a

10   factual dispute is, of itself, not a sufficient basis to deny summary judgment on a qualified

11   immunity claim. *Saucier v. Katz*, 533 U.S. 194, 200 (2001). However, once the Court has

12   concluded that plaintiff's facts would establish a constitutional violation if proven true, and that

13   the right violated is clearly established, the objective reasonableness of the officer's conduct

14   must be determined in light of the facts of the case. Those facts are yet to be determined by a

15   jury, and the final step of the qualified immunity analysis must await that determination.

16   Accordingly, as to plaintiffs' § 1983 claim based on an allegedly unlawful seizure after the traffic

17   stop, the motion for summary judgment on qualified immunity must be denied.

18         A similar analysis applies to plaintiff Davis' § 1983 claim based on an allegedly unlawful

19   arrest. Neither party disputes that, at the time of Davis' arrest, defendants were required to

20   have probable cause for that arrest. Thus there is no dispute that Davis had a clearly established

21   constitutional right to be protected from arrest based on no probable cause. However, as

22   discussed above, there are unresolved factual issues surrounding Davis' refusal to sign his traffic

23   infraction, including whether he was actually presented with an infraction to sign and whether

24   the infraction was actually completed. Again, those are factual decisions to be made by the jury,

25   and the final step of the qualified immunity analysis must await that determination. Accordingly,

26

MEMORANDUM ORDER
PAGE - 18

as to Davis' § 1983 claim based on an allegedly unlawful arrest, the motion for summary

judgment on qualified immunity must be denied.

### F. Pendent State Law Claims

Defendants also argue that plaintiff Davis has completely failed to support any of his

state law claims.  The Court, having stricken the improper overlength briefing by plaintiffs'

counsel in response to those arguments, deems defendants' summary judgment motions

pertaining to the state law claims unopposed.  Accordingly, plaintiff Davis' state law claims for

assault and battery, false arrest/false imprisonment, outrage, negligent infliction of emotional

distress and malicious prosecution, are dismissed.[12]

### G. Pending Motions In Limine

The Court is aware that the parties have filed motions *in limine* which remain pending

for resolution.  (Dkts. #168, #167 and #169).  The Court will address those motions in a

separate order.

### III. CONCLUSION

Having reviewed defendants' motions for summary judgment (Dkts. #107 and #112),

plaintiffs' opposition (Dkt. #150), defendants' replies (Dkts. #157 and #158), the declarations

and evidence in support of those briefs, and the remainder of the record, the Court hereby

ORDERS:

(1) Defendants' motions for summary judgment (Dkts. #107 and #112) are GRANTED

IN PART and DENIED IN PART as follows:

a.  For the reasons set forth above, the Court GRANTS defendants' motions for

summary judgment on the issue of probable cause for the traffic stop, and DISMISSES that

portion of plaintiffs' § 1983 claims made on that basis.

---

[12] Plaintiff McCoy's state law claims were dismissed by a previous Order of this Court on
September 16, 2003.  (Dkt. #32).

MEMORANDUM ORDER
PAGE - 19

b.  For the reasons set forth above, the Court DENIES defendants' motions for summary judgment on the issue of whether the "seizure" after the traffic stop was reasonable.  The Court also DENIES defendants' motion for summary judgment on qualified immunity related to that issue.

c.  For the reasons set forth above, the Court DENIES defendants' motions for summary judgment on the issue of whether Davis' arrest was lawful.  The Court also DENIES defendants' motion for summary judgment on qualified immunity related to that issue.

d.  For the reasons set forth above, the Court GRANTS defendants' motions for summary judgment on the issue of excessive force during arrest, and DISMISSES that portion of Davis' § 1983 claims made on that basis.

e.  For the reasons set forth above, the Court GRANTS defendants' motions for summary judgment on the issue of the pat down search of Salina McCoy, and DISMISSES that portion of McCoy's § 1983 claims made on that basis.

f.  For the reasons set forth above, the Court GRANTS defendants' motions for summary judgment on Davis' state law claims, and DISMISSES Davis' claims for assault and battery, false arrest/false imprisonment, outrage, negligent infliction of emotional distress and malicious prosecution.

(2)  Accordingly, the only claims now proceeding to trial in this action are Davis' § 1983 claim based on an alleged unlawful "seizure" after the traffic stop and based on an alleged unlawful arrest, and McCoy's § 1983 claim based on an alleged unlawful "seizure" after the traffic stop.

(3)  The parties pending Motions In Limine will be addressed in a separate Order.

(4)  The Clerk shall forward a copy of this Memorandum Order to all counsel of record.

MEMORANDUM ORDER
PAGE - 20

DATED this __2ⁿᵈ__ day of December, 2005.


/s/ Ricardo S. Martinez
RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE